Good morning. May it please the Court, my name is Joe Lavin. I represent the appellant Chris Manes in this case. I'm not a Seattleite. I too appreciate the sunshine. The trip over last night from Port Angeles was quite exciting. I bet it was. No blue. And I would like to The clock counts down and then when you run over it starts counting back up, so don't take that as a grant of additional time. Thank you, Your Honor. I know the Court has read the briefs and you're aware that Chris Manes' case has quite a lengthy history. He's had three administrative law judge hearings. He's been to the Appeals Council three times with one remand. He's been to the District Court twice. And with that history, I hope I've not oversimplified the issue that I'm presenting for the Court's consideration today. The parties are in agreement that through the first four steps of the sequential evaluation process, there's no dispute. There's no substantial gainful activity since the alleged onset date. He has severe impairments. His impairments formally met the listing of impairments, but he had medical improvement. And at step four, his residual functional capacity is for a voluntary work activity. And with that capacity, he's incapable of performing any of his past relevant work. So the consideration is whether at step five of the sequential evaluation process, where the burden shifts to the Commissioner, whether that burden was met here with the testimony of the vocational expert. I know I'm told not to read at length from the record. I think we know the record. You're down to 250 jobs, right? That's argument number two. We are down to 250 jobs in one occupation. My first contention and in fact, I have three separate contentions as to why the vocational expert testimony does not rise to the level of substantial evidence. And I think it's cumulative. The restricted range of sedentary residual functional capacity could perform a job that is at the light residual functional capacity level in the dictionary of occupational titles. There's some confusion about whether the erosion of that job is based on sedentary capacity or the sit-stand option. If the record is reviewed carefully, the erosion, the 250 jobs, is the erosion caused by the sit-stand option. When she was asked if you assume a residual functional capacity for sedentary work, she said the occupational base is significantly or severely eroded. If the parking lot attendant in the DOT manual says that it's light work. That was her testimony. And the RFC that the ALJ identified for Mr. Moniz was sedentary work. That's correct. What's the relevance of saying, well, the sit-stand component with the parking lot attendant is something that Mr. Moniz could do? Does the sit-stand component relate to changing a light work occupation to a sedentary work occupation? It's never explained by the vocational expert. If you look, you'll see that when she testified as to the capacity of the job, the ALJ said, well, obviously I'm going to have to change the RFC in this case. And all she said was no. She didn't say no because. All she said was the parking lot attendant job at the light level would allow a sit-stand option. She never said it could be performed at the sedentary level. In fact, she said if it's at the sedentary level, significantly eroded. The occupational base is significantly eroded. Now, what was the ALJ's obligation under the guidance, the SSR00-4P? My reading of the SSR and of the cases that this court has considered, I think it's the ALJ had a duty to figure out or to ask how an individual with a sedentary RFC could perform a job that the DOT recognizes as a light RFC job. And if that was the only thing that had happened here, then I think SSR00-4, Masagi, the Ornberg case would all suggest the case should be remanded so the ALJ could perform that affirmative duty and carry out that analysis. She had to ask a question and the expert had to give a reasonable explanation, I think. That would be my understanding. Did she ask a question? I thought she did ask a question of how the sit-stand would affect the number of jobs. The ALJ did ask the vocational expert, Ms. Ulrich, who I know well, how the light parking lot attendant job would be impacted by the necessary sit-stand option. And it was the light parking lot attendant job that she testified would be restricted, basically cut in half to 250 jobs. That's my second contention. 250 jobs is not a lot of jobs. The only case that the commissioner has cited that provides a basis for some number less than that is the Urovitch case, which was a district court opinion in Arizona, which I contend, if you look carefully at that decision, the ALJ made the decision in the Urovitch case at step four. The ALJ decided that Mr. Urovitch or Ms. Urovitch, I'm not sure, could perform past relevant work. And it was actually the district court which said and carried out the step five analysis saying that with his skills, the claimant in that case could perform some other work. As we've argued in the brief, having job skills provides a wider occupational base than being an unskilled worker. Chris Maness did not have any work skills. He was an unskilled worker. So he doesn't have the wider occupational base that the claimant in the Urovitch case had. So and I was trying to think of clever ways to talk about how many jobs is 250 jobs. Because there are 1,600 occupations at the sedentary and light unskilled level. And within those jobs. I noted that the ALJ, when he first, or she, when the ALJ first starts talking to the vocational expert, she refers the vocational expert to the prior opinion and a finding that had been made. And in that prior opinion, it said, well, there's 28,000 jobs nationally. There's 500 jobs in the local economy. So the number of jobs nationally seemed to be the larger number, at least based on the prior finding of the ALJ. But the ALJ did not make that finding in this case. In this particular case, this was, he was the ALJ, made a finding that 250 jobs in the state of Washington was a significant number. And it's our contention that it's not. But what really distinguishes this case from all the others, and now I've run over my time, but this is very important, is the testimony by the vocational expert. There was no other job or occupation that Mr. Maness could perform with this residual functional capacity. No other work. That serves to distinguish the case from all of the cases cited by the Commissioner. The Johnson case in the Eighth Circuit, if you look carefully at that case, the ALJ recognized three different jobs that were available to the claimant in that case. In the Franklin case, which is from the Western District of New York, the ALJ recognized two jobs. And in fact, if you read the Franklin case, it was remanded because the district court judge believed, on that record, there was not a showing of a significant number of jobs. In the Tenth Circuit case, Trimar, the ALJ, or the vocational expert testified to three different unskilled jobs. In this case, there was one job and one job only. You may want to reserve the rest of your time. Good morning, Your Honors. I'm Catherine Miller on behalf of the Commissioner of Social Security. And I think I'm going to take these off because it makes my voice and it is distracting. So I would first like to start with addressing some of your questions, Judge Akuta. You mentioned that the tenor of the vocational expert testimony in this case clearly  considered the sit-stand option as transforming the light job into a sedentary job. And I think that's exactly what happened in this case. I don't think it was a light job with a sit-stand option that eroded the occupational base, but instead the sit-stand option transformed the job into a sedentary job. Okay. Let me ask you a question, if I may, about that. Yes. Let me assume that that's how the VE was viewing it. But still, what rational explanation did the VE give to explain how 500 jobs that are light get changed to 250 that are sedentary? It seemed like the VE just said that, I'm going to erode it 50%, but really gave no explanation. And if the DOL has classified the job as light rather than sedentary, doesn't the VE have to give a persuasive explanation of how you transform it? Yes, I would agree with that. And in this case, the VE said that, I'm aware that this job can be performed at the sedentary level. So clearly, the VE was relying on their experience in this case. Also, the VE gave regional numbers. DOT does not include regional numbers. So we can infer that this was based on the VE's experience. Also, as you noted, the VE was referring to the prior, was looking at the record from the prior hearing. And that vocational expert also said there were 500 jobs in the Pacific Northwest region, 28,000 jobs nationwide. Perhaps, you know, explicitly stated that the sedentary job was a subsection of the overall job light classification. And if you look at the parking lot attendant job, it encompasses things like valet services, sitting in a booth. There are a number of different jobs that are encompassed in parking lot attendant job. But that's what troubled me. She says it's based on the size of the booth, or you know criterion. Because of the policy of the employer? You say we should infer, she's basing it on her experience. I find that to move something from a light category to a sedentary category and then give that kind of non-specific and sort of a whatever type of treatment doesn't sound sufficient to me. Well, I would respectfully disagree and say that in Tackett, this Court has said that the ALJ may take administrative notice of any reliable. Reliable, yes. That's why I'm saying it didn't seem sufficient. Right. Kind of whatever. Well, that's an unfortunate choice of words. I agree with you in that respect. However, the vocational expert's expertise provides the foundation of reliability. And some of this Court's decisions where you've held that were not cited in the briefing, I noted. But the V.E.'s expertise provides that foundation for reliability. Well, sure. Doctors have expertise in this whole process. We're always emphasizing that we know that. But then we also say there's a duty on the part of the ALJ to probe, not to just say, oh, well, as long as they put words out there. Right. And the words that got put out there seem rather shaky to say that, well, it's the size of the booth or the policy of the employer or whatever. I think the V.E. was saying that would be a slight additional erosion, though, when he was speaking about the size of the booth and the policy of the employer. Okay. Can you explain, though, how the ALJ complied with the policy SSR004P? Among other things, it requires the ALJ to explain in the determination or decision how he or she resolved the conflict. And I didn't see anything that really came close to an explanation of the identification of the parking lot attendant and the DOT and his RFC, that it was only sedentary work for Mr. Maness. Yes. Well, this was a pre-Misaci case where this Court obviously imposed a very strict duty on the ALJ to inquire about any specific conflicts. The ALJ here the Well, excuse me, though. I mean, it may be pre-Misaci, but it's post the policy, right? Absolutely. I would agree with you on that. And I think in this case, the V.E. pardon me, the ALJ, their question to the V.E. acknowledged that there was a conflict because he asked if this light job with the sit-stand option could be performed at the sedentary level. So there was an acknowledgement of the conflict in the question itself. And then the V.E.'s testimony resolved this conflict by saying, yes, it could be performed at the sedentary level, but there would be an erosion of the occupational base. I think the tenor of the V.E. testimony, you know, it's not perfect, but I think you can see that the V.E. here clearly equated the sit-stand option with the sedentary exertional level. And I just want to emphasize, too, that this is not a restricted range of sedentary work that the ALJ found. It was a significant range. And, in fact, the lifting and carrying is really more consistent with light work for this particular individual. I'd also like to address the numerical significance issue. This Court has said that whether there are a significant number of jobs in the national economy is a question of fact to be determined by a judicial officer. Here the ALJ made a very specific fact finding that 250 jobs is a significant number in the national economy. And that finding is supported by substantial evidence, it's supported by reliable V.E. testimony, and it clearly falls within the parameters established by this Court in the Barker case. This Court looked at cases from other jurisdictions and found, on the one hand, 3,700 jobs. Anything as low as 250? The Urovitch case, we can infer that it's about 150 to 240 jobs in that case, and this Court implicitly accepted that. Was that Urovitch, was that statewide or was that countywide? That was countywide, but this Court in the Martinez case specifically rejected any kind of percentage or ratio analysis. The Ninth Circuit doesn't look at the size of the region. That argument was raised. I don't quite understand that. You're relying on Urovitch, which had a percentage. Yes. That's how you, in that, in Urovitch, didn't they, weren't they dealing with a 25 percent of 600 was the low end of the range? That's right. Okay. And that's within a, within a district. And I asked, my question was, where is it that the number 250 is supported? And you're citing Urovitch as your example. Pardon me, I misunderstood. So we're supposed to rely on that? I guess I'm not understanding. Well, I'm saying there's parameters established by this Court in the Barker case. Those parameters are what? Well, 150, at least this Court has addressed, 150 to 3,700, although I'm certainly not arguing that. This Court addressed that? This Court said we'll take it all the way down to 25 percent of 600 on a statewide basis, is what we considered and said? This Court implicitly said that. I wouldn't rely on implications from a decision that doesn't specifically address the issue. It may, it was dealing with the facts of that case. But if that's your, that's your best authority in any event, for 250. Well, I would say that this Court at least has looked at parameters. That's how this Court has decided, unlike other circuits, which look at a number of other factors. This Court tends to look at just the number, whether the ALJ has made a specific fact finding, and whether that fact finding is supported by substantial evidence. The standard is significant in the national economy, right, significant numbers in the national economy. Are there, is there any guidance, Social Security guidance documents about what constitutes, how you reduce that to significant in the state economy, significant in the county economy? Your Honor, we defer to vocational experts in that case. Although the V.E. does not determine what is significant, the ALJ does. But they are the ones who come up with the numbers in this case. So it really is the ALJ's fact finding. Okay. Thank you. Thank you very much. Your Honor was correct. Urovitch dealt with a limited number of cases in Maricopa County, Arizona, which I think is where Phoenix is. And again, it was decided by the ALJ at the fourth step of the sequential evaluation process. And the district court. That's where the burden is on the claimant at that point. That's correct. And the district court judge actually carried out the step five analysis, whereas it appears from reading the case that the ALJ never did. I know I'm probably over my time. I just have to emphasize that at the conclusion of the vocational experts testimony, she was asked, would there be any other jobs that you're aware of he would be able to do? Let's talk sedentary and then move to light with a sit-stand option. You know I'm going to say no. That's what makes this case different. You have a question? I'm sorry. Thank you very much. Thank you very much. All right. Thank you very much, counsel. Appreciate the argument. Case argued and submitted.
judges: Fisher, Gould, Ikuta